## CASE NO. 15-2105

_____

# In the United States Court of Appeals for the Fourth Circuit

_____

STEPHEN WILKINSON, Plaintiff - Appellee

v.

SUN LIFE AND HEALTH INSURANCE COMPANY, d/b/a Sun Life Financial,
Defendant – Appellant

DOLAN & TRAYNOR, INC. EMPLOYEE HEALTH
AND WELFARE BENEFIT PLAN, Defendant.

_____

On Appeal From the United States District Court
for the Western District of North Carolina at Statesville

_____

**REPLY BRIEF FOR SUN LIFE AND HEALTH
INSURANCE COMPANY, d/b/a Sun Life Financial**

_____

Joshua Bachrach
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Two Commerce Square
2001 Market Street, Suite 3100
Philadelphia, PA 19103
215-606-3906
joshua.bachrach@wilsonelser.com

Hannah Gray Styron Symonds
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
260 Franklin Street, 14th Floor
Boston, MA 02110
617-422-5300
Hannah.Symonds@wilsonelser.com
*Counsel for Defendant – Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................. 1

RESPONSE TO APPELLEE'S STATEMENT OF THE CASE ............................ 2

ARGUMENT ..................................................................................... 5

     A.    The Abuse of Discretion Standard of Review Applies. ....................... 5

     B.    Wilkinson Has Presented No Evidence Supporting His Claim. .......... 7

     C.    Sun Life's Evidence Supports the Denial of Coverage...................... 13

     D.    The District Court's Erroneous Application of the Law.................... 15

     E.    *Booth* Does Not Permit a Court to Consider New Evidence. ............ 17

     F.    The District Court Erroneous Reliance on *Bowers v. LINA*. ............. 18

     G.    Wilkinson Was Ineligible for Benefits under the Prior Policy. ........ 19

     H.    Sun Life Cannot be Estopped from Denying Benefits Not Owed. ........................................................................ 23

     I.    Sun Life is Entitled to Judgment on the Counterclaim. ..................... 26

CONCLUSION ................................................................................. 28

CERTIFICATE OF COMPLIANCE..................................................... 30

CERTIFICATE OF SERVICE ............................................................ 31

# TABLE OF AUTHORITIES

## Cases

*Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*,
  201 F.3d 335 (4th Cir. 2000) ................................................................17

*Bowers v. Life Ins. Co. of N. Am.*,
  21 F. Supp. 3d 993 (D. Minn. 2014)........................................... 18, 19

*CIGNA Corp. v. Amara*,
  __ U.S. __, 131 S. Ct. 1866, 179 L.Ed.2d 843 (2011)........................24

*Cosey v. Prudential Ins. Co. of Am.*,
  735 F.3d 161 (4th Cir. 2013) ...............................................................5, 6

*Dickerson v. Colgrove*,
  100 U.S. 578 (1879)..............................................................................24

*EEOC v. Navy Fed. Credit Union*,
  424 F.3d 397 (4th Cir. 2005) ...............................................................25

*Elliott v. Sara Lee Corp.*,
  190 F.3d 601 (4th Cir. 1999) ...............................................................15

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989)................................................................................5

*Glass v. United of Omaha Life Ins. Co.*,
  33 F.3d 1341 (11th Cir. 1994) .............................................................18

*Harrison v. Wells Fargo Bank, N.A.*,
  773 F.3d 15 (4th Cir. 2014) .................................................................16

*Hensley v. IBM*,
  123 Fed. Appx. 534 (4th Cir. 2004).....................................................24

*Huizing v. Metropolitan Life Ins. Co.*,
  No. 1:08-CV-878, 2010 U.S. Dist. LEXIS 3173 (W.D. Mich. Mar. 31, 2010) .....6

ii

*Jones v. Life Ins. Co. of North America*,
  829 F. Supp. 2d 165 (W.D. N.Y. 2011) ..................................................27

*Lamb v. Hartford Life and Acc. Ins. Co.*,
  862 F. Supp. 2d 1342 (M.D. Ga. 2012) ..................................................27

*LeFebre v. Westinghouse Elec. Corp.*,
  747 F.2d 197 (4th Cir. 1984) ................................................................16

*Lewis v. Life Ins. Co.*,
  578 Fed. Appx. 176 (4th Cir. 2014)........................................................10

*McKay v. Reliance Standard Life Insurance Co.*,
  428 Fed. Appx. 537 (6th Cir. 2011).................................................. 22, 23

*Montanile v. Bd. Of Trustees of the Nat'l Elevator Ind. Health Ben. Plan*,
  No. 14-723 ............................................................................... 27, 28

*Northcutt v. Gen. Motors Hourly-Rate Employees Pension Plan*,
  467 F.3d 1031 (7th Cir. 2006) ...............................................................27

*Parent v. Principal Life Ins. Co.*,
  763 F. Supp. 2d 257 (D. Mass. 2011)......................................................27

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery*,
  324 U.S. 806 (1945).............................................................................25

*Rice v. Sun Life & Health Ins. Co.*,
  No. 12-1362, 2014 U.S. Dist. LEXIS 127 (W.D. Mich. Jan. 2, 2014)..................7

*Rowan v. Unum Life Ins. Co. of Am.*,
  119 F. 3d 433 (6th Cir. 1997) ...............................................................14

*Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*,
  32 F.3d 120 (4th Cir. 1994) ...................................................................8

*Teco Coal Corporation v. Looney*,
  No. 1:08-CV-00024, 2008 U.S. Dist. LEXIS 95826 (W.D. Va. Nov. 25, 2008)...7

**Regulations**

20 C.F.R. 404.1574 ....................................................................................10

**Other Authorities**

http://my.clevelandclinic.org/services/heart/disorders/heart-failure-what-
   is/ejectionfraction....................................................................................13

http://www.dolan-traynor.com/index.html ..........................................................12

# INTRODUCTION

The primary issue in this lawsuit is whether Wilkinson was ever insured by Sun Life. To be eligible for coverage under the Sun Life Policy, Wilkinson had to prove that he was "*[p]erforming all of the duties of [his] job on a Full-time basis and working on a regular work schedule of at least 30 hours per week*" between May 1, 2004, when Sun Life began insuring the Plan and May 7, 2004, when he claims that his disability began. JA 1356. Contrary to these requirements, Wilkinson's employer confirmed that he "spent little time at work from August 18, 2003 through May 7, 2004."

Despite the length of Wilkinson's appeal brief, he does not identify any evidence that he actually worked during the relevant time. In support of his position, Wilkinson relies mostly on his receipt of salary until May 7, 2004. Receipt of salary by itself cannot be considered adequate "proof" of disability when Wilkinson agreed to go on leave before Sun Life began to insure the Plan in exchange for his employer continuing his salary, which it did for two more weeks. Wilkinson's inability to support his claim to Sun Life, in the district court and before this Court justify reversal of the decision in his favor and judgment in favor of Sun Life.

## RESPONSE TO APPELLEE'S STATEMENT OF THE CASE

Wilkinson begins his appeal brief by stating that "prior to his disability, [he] was working 60 hours per week …."  Since the question of whether Wilkinson was actually working immediately prior to claiming disability is the key issue in this case, one would expect him to support this statement with his best evidence.  The document identified by Wilkinson as supporting his claim simply states that he stopped working when he "was unable to sustain the typical 60-hour week."  JA 276.  The question unanswered by this document is when he stopped working at least 30 hours per week?

On page 3 of his Brief, Wilkinson accuses Sun Life of omitting from its brief a "critical sentence" from the Declaration he filed in his New Jersey lawsuit against Dolan & Traynor ("D&T").  It is Wilkinson who relies on a single sentence that is taken out of context.  As noted in Sun Life's opening brief, in paragraph 12 of Wilkinson's Declaration, he stated that:

> At that April 21st meeting, Timothy Dolan asked that I take the leave now and they would continue to pay my salary until a written agreement was reached laying out the terms of my leave.

JA 999.  As stated in the next sentence, Wilkinson "agreed to take the leave of absence with Tim Traynor's agreement that, in a few weeks, they would have a written agreement prepared for me and that my health insurance would continue."

This can only be read as Wilkinson agreeing to take leave "now" i.e. on April 21, 2004, while waiting for the written agreement.

In reality, Wilkinson stopped working full-time for D&T even before April 21, 2004. In Wilkinson's Declaration, he stated that he "worked on and off from August 2003 until March 2004." JA 998. Based on the April 21, 2004 meeting, it is impossible to believe that Wilkinson returned to work full-time in May. Moreover, Wilkinson's position that on April 21, 2004 he only agreed to take a leave of absence that would begin a few weeks later simply makes no sense. Either he was physically disabled or not.

Wilkinson's Declaration refers to two separate events. The first is when he stopped working. This occurred on April 21, 2004. JA 999. The second event is when he stopped receiving salary and went on unpaid FMLA leave. We agree that this took place on May 7, 2004. Under the Sun Life Policy, it does not matter if he received salary on or after May 1, 2004. Since he was not actually full-time at least 30 hours per week, he was not insured by Sun Life. JA 1356.

There are other statements related to his New Jersey lawsuit which support the conclusion that Wilkinson was not actively working full-time on or after May 1, 2004. For example, Mr. Dolan stated that there was a "drastic reduction in [Wilkinson's] attendance and production" and that he "spent very little time working" beginning in August 2003. JA 917. D&T also stated in pleadings that it

3

"could have easily terminated Wilkinson's employment as Vice President when he decided to stop working.  If Wilkinson was actually working full-time as he claims, D&T would not have demanded those meetings with him in March and April 2004. JA 998-999.

On page 3 of his brief, Wilkinson claims that "[o]n May 7, 2004, [he] was forced to leave work due to debilitating cardiomyopathy with congestive heart failure, dyspnea and severe fatigue."  However, Wilkinson did not even see a doctor during the entire month of May 2004.  On the other hand, on April 20, 2004, one day before Wilkinson agreed to take leave "now" he was seen by a cardiologist for "moderate to severe left ventricular dysfunction."  JA 925. Wilkinson did not see any doctor until June 7, 2004.  JA 925.  It is obvious that nothing changed medically on May 7, 2004.  These facts further support Sun Life's position that he was disabled before May 1, 2004.

Wilkinson refers to dates on various forms in which he stated that he was working until May 7, 2004.  These self-serving statements are not evidence of actual work or the number of hours he supposedly worked.  It also does not matter that the Social Security Administration found him to be disabled under its rules as of May 8, 2004.  As explained in the Social Security Decision, if a person has earnings above the minimal level identified in the regulations, "it is presumed that

he has demonstrated the ability to engage in SGA[1] … [and] he is not disabled regardless of how severe his physical or mental impairments are ….”  JA 1183. Because Wilkinson received his full and sizeable salary until May 7, 2004, he was not eligible for Social Security Administration disability benefits sooner.[2]

## ARGUMENT

### A.    The Abuse of Discretion Standard of Review Applies.

Sun Life sincerely believes that the ERISA standard of review is not determinative in this case.  Wilkinson has not identified a single job duty that he supposedly performed on or after May 1, 2004; therefore, he did not sustain his burden of proof even under *de novo* review.  Nevertheless, the district court correctly applied the abuse of discretion standard of review based on the language granting discretionary authority.

Where a plan grants discretion to an administrator to make eligibility determinations, a denial of benefits will be reviewed for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989); *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 165 (4th Cir. 2013).  According to Wilkinson, the clear grant of discretion in this case (JA 159) should not be

---

[1] “SGA” refers to substantial gainful activity.  JA 1183.

[2] Wilkinson was married to the daughter of the company founder.  JA 998. Accordingly, D&T continued to pay his salary even though he performed little if any work after his wife’s death in August 2003.  JA 917.

applied.[3]  In making this argument, he primarily relies on cases addressing whether discretionary language included in a Summary Plan Description ("SPD") is ineffective.  Sun Life is not relying on a SPD for discretion.

*Cosey*, which is relied on by Wilkinson, did not address the issue presented here.  The short and long term disability policies in that case did not include discretionary language.  The administrator relied on language in a separate SPD and an Administrative Services Agreement that was not entered into until months after the disability claim arose.  *Cosey*, 735 F.3d at 168-170.  The Court concluded that these other documents could not be relied on to grant discretion.  *Id*.  There is no dispute that the ERISA Rights language in this case was delivered with the Policy even though those two pages are not numbered.  JA 130-159.

Many courts addressing discretionary clauses presented in the same manner have held that deferential review applies.  In *Huizing v. Metropolitan Life Ins. Co.*, No. 1:08-CV-878, 2010 U.S. Dist. LEXIS 3173 (W.D. Mich. Mar. 31, 2010), the court rejected the argument for *de novo* review, stating:

> The Court finds no basis for limiting the Plan to simply the Certificate of Insurance.  The 'ERISA Information' document provides detailed information concerning the Plan and ERISA benefits, including a Statement of ERISA Rights required by federal law and regulation. Plaintiff has not provided any specific authority to the

_____

[3] Wilkinson's own Complaint refers to the deferential standard of review as applying to his claims.  JA 9, 17, 19.

> contrary. The Court therefore concludes that the
> document is properly considered part of the Plan. The
> arbitrary and capricious standard applies to plaintiff's
> claim.

*See also Teco Coal Corporation v. Looney*, No. 1:08-CV-00024, 2008 U.S. Dist. LEXIS 95826 (W.D. Va. Nov. 25, 2008) (relying on the "ERISA Information and Statement of ERISA Rights"); *Rice v. Sun Life & Health Ins. Co.*, No. 12-1362, 2014 U.S. Dist. LEXIS 127 (W.D. Mich. Jan. 2, 2014) (holding there was "no reason to conclude that the ERISA Rights provisions are not part of the Plan").

### B.    Wilkinson Has Presented No Evidence Supporting His Claim.

To be eligible for insurance/benefits under the Sun Life Policy, Wilkinson had to prove that he was "[p]erforming all of the duties of [his] job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week" between the time the Sun Life coverage began on May 1, 2004 and the date of his claimed disability on May 7, 2004. JA 1356, 1362. Beginning on page 15 of his brief, Wilkinson identifies what he describes as "evidence of coverage." None of the evidence he identifies suggests that he was performing even one of his job duties, let alone all of them for at least 30 hours per week.

The first "evidence" relied on by Wilkinson as supporting his eligibility is the FMLA Request.[4] According to the district court, this form "is consistent with

---

[4] These arguments are made without waiver of Sun Life's position that the FMLA Request is inadmissible because it was not in the record at the time of its final

Plaintiff's claim that he began his leave on May 7, 2004." JA 236. The actual statements on the Request do not support the district court's statement or Wilkinson's reliance on it. First, in the FMLA Request, Wilkinson sought leave "beginning on or about May 10, 2004," *not* May 7. JA 201. Moreover, the Request was first made in April 2004 and dated May 5, 2004. JA 203. How could Wilkinson know that he would become disabled at a later date? It is obvious that Wilkinson already stopped working before May 1, 2004. The only thing that changed was the discontinuation of salary and that is not the test for eligibility under the Policy.

Wilkinson next relies on the statements made on the disability insurance enrollment form and application for benefits. According to him, these statements show that "he believed that he continued to be an active employee at D&T." Wilkinson's personal beliefs and whether D&T considered him to be an "active employee" are not eligibility requirements for coverage under the Sun Life Policy. In its opening brief, Sun Life cited to numerous decisions in which claimants and their employers considered them to be active employees but the courts still concluded that coverage was not owed based on the specific eligibility requirements in the policies. See opening brief at pages 23-26.

---

decision. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir. 1994).

According to Wilkinson, he had no reason to lie about his date of disability since he was insured under the prior disability carrier's policy in April 2004. This statement is incorrect for a few reasons. First, no one has accused him of lying. Second, while Wilkinson was *insured* under the prior Unum disability policy, he was ineligible to receive benefits under it because he received his full salary until after that policy expired, contrary to Unum's definition of "disability." JA 1295. Moreover, this is not evidence that he was actually working.

Likewise, the date used by Mr. Wilkinson on his life insurance waiver of premium applications is not evidence of actual work. Wilkinson was already insured by those insurers and entitled to the waiver whether he became disabled on April 21 or a day in May 2004. This only proves that Wilkinson did not believe that he was disabled while he received his salary, not that he was actually working in May 2004.

As his sixth point, Wilkinson relies on the Declaration of his personal accountant, Robert Rabkin. Without elaboration, Mr. Rabkin simply states that "as trustee [he] was aware of Mr. Wilkinson's health conditions and his need to go out on disability as of May 7, 2004." JA 363. He does not state on what information his belief was based. We do not even know when he last spoke with or saw Wilkinson prior to May 7, 2004. Mr. Rabkin's Declaration is not proof that

Wilkinson actually worked the required number of hours under the Policy in May 2004.

Next, Wilkinson relies on certifications from Mark S. Rosenthal, M.D., who listed the disability onset date as May 7, 2004. Those certifications were prepared months later, on August 13 and October 4, 2004. JA 1486, 1544. Dr. Rosenthal did not even see Wilkinson until June 7, 2004, one month after he claims that he became disabled. JA 925, 1486.

On page 19 of his brief, Wilkinson again refers to the Social Security decision which "found that [he] became disabled under their rules as defined by the Social Security Act on May 8, 2004." Wilkinson could not be considered disabled "under their rules" sooner because he received salary until May 7, 2004. *See* 20 C.F.R. 404.1574. For the same reason, Wilkinson's reliance on the award of New Jersey Temporary Disability Benefits is not proof that he was working prior to May 7, 2004. The Notice relied on by Wilkinson states that benefits are not paid for any period in which he received "regular weekly wages." JA 1488.

Wilkinson next relies on his receipt of his full salary through May 7, 2004 as alleged proof that he was working. This cannot be considered proof that he was actually working at least 30 hours per week when D&T initially agreed to pay his salary while he was on leave. JA 999. This case is no different than *Lewis v. Life Ins. Co.*, 578 Fed. Appx. 176 (4th Cir. 2014) or the numerous other cases cited in

Sun Life's opening brief in which courts concluded that the receipt of salary is not proof of eligibility.

For his next alleged proof, Wilkinson relies on a few statements made by D&T on claim forms. In doing so, he ignores the statements made by the employer in the New Jersey lawsuit. For example, D&T stated that Wilkinson resigned "because he suffered from a disability that prevented him from working for more than a year." JA 843. The resignation occurred on September 14, 2004, meaning that he stopped working several months before the Sun Life Policy became effective. JA 845, 1002-03. D&T also stated in pleadings that there was a "drastic reduction in [Wilkinson's] attendance and production" and that he "spent very little time working" beginning in August 2003. JA 917. D&T's statements hardly support the claim.

Wilkinson also refers to isolated statements from the Declaration of Mr. Dolan but omits the key sentence. In paragraph 37, Mr. Dolan stated:

> … Wilkinson spent little time working from August 18, 2003 through May 7, 2004 because of emotional and physical problems. Despite a drastic reduction in his attendance and production, D&T voluntarily paid Wilkinson $451,300 from August 22, 2003 until he ceased working completely on May 7, 2004.

JA 917. The remaining points raised by Wilkinson also do not provide any evidence that he actually worked in May 2004.

11

On page 21 of his brief Wilkinson claims that no records exist regarding the work he performed because D&T is a small "plumbing supply company." Not exactly. D&T is a distributor of commercial and residential "building specialties" with showrooms in New York City and New Jersey.[5] It is impossible to believe that in his capacity as company Vice President, Wilkinson could have worked for an entire week without producing a single record, sending an e-mail or seeing another employee who could attest that he was there.

Remarkably, Wilkinson blames Sun Life for not investigating sooner the information *he provided* regarding the onset of disability. Sun Life had no reason to initially question the information until it received the pleadings from the New Jersey lawsuit which showed that Wilkinson stopped actively working at the latest in April 2004. Upon receipt of that information Sun Life gave Wilkinson every opportunity to prove that he actually worked in May 2004 but none was provided.

Wilkinson's brief fails to address other evidence which demonstrates that he was not working in May 2004. Wilkinson was required to "[p]lan, direct and coordinate the storage and distribution operations." JA 499. This would necessarily involve interaction with others and the preparation of documents, none of which were ever provided from May 2004. In his job, Wilkinson had to occasionally lift up to 100 pounds. JA 499. However, less than two weeks before

---

[5] http://www.dolan-traynor.com/index.html

the Sun Life Policy began, Wilkinson's cardiologist diagnosed him with moderate to severe LV dysfunction and cardiomyopathy with an ejection fraction of just 30%.  JA 925.  An ejection fraction between 55 and 70% is normal.[6]  At 30%, Wilkinson was at risk for sudden cardiac arrest.  There is no evidence that Wilkinson could perform the duties of his job in May 2004, let alone that he actually did so.

Wilkinson alleged in his Complaint that his job involved sales and training but he cannot identify a single person he trained or any sales activities.  JA 10. Even if it is believed that documents were destroyed or could not be produced due to confidentiality, both of which are suspect, Wilkinson should have been able to identify at least one person he worked with in May 2004, but he could not.  To this day, including in his brief to this Court, Wilkinson has not identified any job duties that he actually performed in May 2004.

### C.    Sun Life's Evidence Supports the Denial of Coverage.

Wilkinson primarily attacks Sun Life's reliance on his Declaration in which he stated that on April 21, 2004 he agreed to leave "now."  Notwithstanding the use of the word "now," Wilkinson would have this Court believe that he did not start his leave until May 7, 2004.  May 7, 2004 is simply when his pay was terminated and the unpaid leave began.  JA 917, 999.

---

[6]    http://my.clevelandclinic.org/services/heart/disorders/heart-failure-what-is/ejectionfraction

According to Wilkinson, although he worked fewer hours, he still worked more than 30-40 hours per week. There is no proof of this in the record. As supposed support, Wilkinson refers to the employer's section of his application for benefits. It is apparent that the D&T human resources personnel had no idea when Wilkinson actually worked.

Terry Millin of D&T told Sun Life that employees would tell her when they were taking time off due to vacation or sickness and it would be logged in. JA 1563. Wilkinson had 25 days of available time off but did not use any of them. Wilkinson admittedly missed work for doctor's visits and also missed time due to surgery in March 2004. JA 925. Yet human resources was unaware of any of that time off. JA 1563.

As stated in the opening brief, the dates of medical treatment are also substantial evidence that Wilkinson stopped working on April 21, 2004. According to Wilkinson it is unreasonable to connect the timing of doctor visits with his alleged onset. Contrary to his position, courts have recognized that a lack of medical treatment when it is reasonably expected weighs against a disability claim. *See Rowan v. Unum Life Ins. Co. of Am.*, 119 F. 3d 433, 437 (6th Cir. 1997).

One day before Wilkinson's meeting with D&T on April 21, 2004, he was seen by his cardiologist complaining of orthostatic dizziness. JA 925. The doctor noted that he was not at full strength, was not eating well following surgery several

14

weeks earlier and was suffering from moderate to severe LV dysfunction. JA 925. There was no further treatment until one month *after* Wilkinson claims that he became disabled. If his condition worsened to the point of disability two weeks after the April 20, 2004 office visit as he claims, it is reasonable to believe that he would have seen a doctor without waiting a month.

Even the district court recognized that there was an "absence of records documenting Wilkinson's daily work activities." JA 239. Based on this finding alone the court should have ruled in favor of Sun Life. The evidence relied on by Sun Life and Wilkinson's inability to identify any work that he performed during the relevant time support Sun Life's conclusion under any standard of review and warrant reversal of the district court's decision.

**D.    The District Court's Erroneous Application of the Law.**

The district court criticized Sun Life because it "did not engage in a searching or 'leave no stone unturned' investigation." JA 238. This is not an accurate statement of the parties' burdens of proof. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir. 1999) (recognizing that it is the claimant's burden to prove eligibility). Wilkinson tries to argue that this statement by the lower court does not reflect a shifting of the burden. It cannot be read any other way.

The district court relied on its erroneous belief that Sun Life was required to conduct a "searching" investigation in support of its conclusion that "Sun Life's

15

decision making process was not reasoned and principled." JA 237. Since no such duty was actually owed by Sun Life, the district court's ultimate conclusion must be considered erroneous.

Citing to district court decisions from another circuit, Wilkinson argues that Sun Life had a duty to investigate his claim. The law of this Circuit is different. *See Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014) ("[n]othing . . . requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case"); *LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 208 (4th Cir. 1984). Moreover, both the district court and Wilkinson failed to identify what additional investigation Sun Life could have conducted.

Wilkinson argues that *Harrison* placed a duty on Sun Life to conduct an investigation. In *Harrison*, the plan's reviewing doctor stated that the record was incomplete which prevented him from stating an opinion. *Harrison*, 773 F.3d at 22. Also, some of the records already in Harrison's file supported the claim. *Id.* at 23. Therefore, the Court concluded that the claimant did not receive a full and fair review. Those facts are not present in this case. Wilkinson's arguments cannot negate the district court's erroneous decision which was based on its mistaken belief that Sun Life was required to conduct a "'leave no stone unturned' investigation." JA 238.

### E.      *Booth* Does Not Permit a Court to Consider New Evidence.

In finding in favor of Wilkinson, the district court relied heavily on the leave date stated on the FMLA Request.  In fact, the court found this to be "most compelling."   JA 236.  As explained above, this form is not evidence that Wilkinson actually worked "full-time" as required under the Policy in May 2004.  It does not even clearly state that his unpaid leave began on May 7, 2004 as he claims and the court found.[7]   Regardless, the evidence never should have been considered.

In *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2000), the Court held that one factor in deciding if an administrator abused its discretion is "the adequacy of the materials considered to make the decision and the degree to which they support it."  While a finding that the record is inadequate may lead a court to conclude that the denial was an abuse of discretion perhaps warranting a remand for further review, it does not authorize a court to become a substitute administrator and consider that evidence in the first instance.

Beginning on page 37 of his brief, Wilkinson tries to justify the district court's heavy reliance on the FMLA Request.  According to Wilkinson, this document is "compelling" because it shows that he "received his full salary from

---

[7] Wilkinson sought FMLA leave "beginning on or about May 10, 2004."  JA 201.

17

his employer for full-time work until his leave commenced on May 7, 2004." Nowhere on the Request does it state that Wilkinson worked full-time until May 7, 2004. JA 201. And as noted above, the Request does not even confirm that the leave commenced on May 7. The fact that Wilkinson received a salary until the FMLA leave began is also not proof that he was working prior to that event. *See e.g. Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341 (11th Cir. 1994).

The facts do not support Wilkinson's position that he worked until the FMLA leave began. First, on April 21, 20014, Wilkinson "agreed to take the leave of absence with Tim Traynor's agreement that, *in a few weeks*, they would have a written agreement prepared." JA 999 (emphasis added). Until then, Wilkinson would continue to receive his salary. JA 999. There is also no dispute that the leave was necessitated by the disability. How could Wilkinson know in April 2004 that he was going to become disabled weeks later? Wilkinson stopped full-time working at the latest on April 21, 2004 and probably much earlier.[8] JA 917.

### F.    The District Court Erroneous Reliance on *Bowers v. LINA*.

Wilkinson ignores nearly every argument raised in the opening brief regarding the district court's misplaced reliance on *Bowers v. Life Ins. Co. of N. Am.*, 21 F. Supp. 3d 993 (D. Minn. 2014). For example, he fails to acknowledge

---

[8] Contrary to Wilkinson's statement on page 39 of his brief, the district court's improper reliance on the FMLA Request is not its "primary litigation strategy in this case." In fact, the argument appears far down in the opening brief.

the differing standards of review.  Wilkinson also argues that *Bowers* is "instructive" because it is "factually similar."  In making this argument he ignores the critical differences previously identified by Sun Life.

Unlike this case, the plaintiff in *Bowers* submitted an affidavit stating that he worked over 30 hours per week.  Supporting that statement was an e-mail from the employer confirming that he worked "25-40 hours per week."  Bowers' supervisor also submitted an affidavit stating that the claimant "worked an average of 30 hours per week."  *Id*. at 1002.

In contrast to the facts in *Bowers*, there is no affidavit from Wilkinson in which he affirmatively stated that he worked full-time for even one day in May 2004.  Wilkinson did not even make such an allegation in his Complaint even though it is the sole issue in this case.  JA 7-15.  Unlike *Bowers*, Wilkinson also has not presented e-mails or affidavits from co-workers confirming that he worked during the relevant period.  *Id*. at 1002.

### G.    **Wilkinson Was Ineligible for Benefits under the Prior Policy.**

Prior to May 1, 2004, D&T's disability plan was insured by Unum.  Wilkinson insists that if he was disabled prior to May 2004 he would have been eligible to receive benefits under the Unum policy.  Wilkinson's position is mistaken.

The Unum Policy provides as follows:

> You are disabled when Unum determines that:
>
> -   you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> -   *you have a 20% or more loss in your indexed monthly earnings due to the same sickness or disease*.
>
> * * *

JA 1295 (emphasis added).  Wilkinson admits that he continued to receive his full salary until May 7, 2004.  Therefore, under the plain language in the Unum policy, he could not be considered "disabled."

In attempting to argue that he was covered by the Unum policy, Plaintiff first argues that the 20% loss in monthly earnings requirement included in the definition of "disabled" would not have applied to his claim because "salary continuation" does not count as income to be offset against LTD benefits.  Plaintiff is trying to merge two completely unrelated policy terms.

Under the heading "[h]ow does Unum define disability" the Policy includes as a requirement that the individual have a 20% or more loss of earnings.  JA 1295.  This is an *eligibility* provision.  After a person satisfies the eligibility requirement of being disabled, and under a separate section, the Unum policy explains how benefits are calculated, stating that "Unum will not subtract from your gross disability payment income you receive from … salary continuation."  JA 1299.

Because Plaintiff was never "disabled" under the Unum definition, there was no need to calculate the "disability payment."

There is an additional reason why the "salary continuation" language cannot be applied to the salary received by Wilkinson. Under the Unum policy, these payments "must be part of an established plan maintained by [the] employer for the benefit of all employees covered under the Policy." JA 1312. Contrary to this requirement, the payments made to Wilkinson after he stopped working were not part of an established plan that applied to "all employees." The arrangement applied only to Wilkinson for the sole purpose of having him leave the company immediately. JA 999.

Contrary to the language in the Unum policy, Wilkinson also argues that he would have remained insured by Unum through May 2004 since he was on a "leave of absence." "Leave of absence" is a defined term which Wilkinson fails to address. To qualify as a "leave of absence" it must be "agreed to in advance in writing by your Employer." JA 1310. When Wilkinson agreed to take leave from D&T on April 21, 2004, it was agreed that a written agreement would be prepared "in a few weeks." JA 999. Most important, but ignored by Wilkinson, "leave of

absence" does *not* include "any period of disability."  JA 1310. Therefore, there was no "leave of absence" under the Unum policy.[9]

Wilkinson once again misstates Sun Life's position on page 43 of his brief. Sun Life has never accused Wilkinson of intentionally misrepresenting his status to gain coverage under its policy versus the Unum policy.  Wilkinson probably believed that he was covered under the Sun Life policy because he continued to receive a salary from D&T until May 7, 2004, during which time Sun Life insured the plan.  This is not an unheard of occurrence.  *See McKay v. Reliance Standard Life Insurance Co.,* 428 Fed. Appx. 537, 547 (6th Cir. 2011).  But contrary to Wilkinson's position, his *mens rea* is not one of the eligibility requirements for coverage under the Sun Life policy.  JA 1356.

In *McKay*, the claimant continued to receive his full salary from his employer until January 2004 even though he stopped working in December 2003. On January 1, 2004, Reliance Standard replaced Unum as the plan insurer.  The court had no trouble concluding that McKay did not meet the "financial prong" of the definition of disability in the Unum policy based on his receipt of salary while the Unum policy was in place.  The court also affirmed the judgment in favor of Reliance Standard - who, like Sun Life, was the successor insurer - because

---

[9] Wilkinson's argument also ignores the language in the Unum policy which states that "coverage under the policy or a plan ends on the earliest of … the date the policy or a plan is canceled."  JA 1293.  The Unum policy canceled on April 30, 2004.

McKay was not an active employee when it insured the plan. *McKay* confirms that Wilkinson's interpretation of the Unum policy is incorrect and that no coverage is owed by Sun Life.

Page 43 of Wilkinson's brief includes other inaccuracies. Wilkinson states that the Sun Life and Unum policies provide "virtually identical coverage" but we know that the definitions of disability are very different. JA 1295, 1361. Wilkinson also argues that if there was a chance that the Unum policy applied, it would be expected that Sun Life would have immediately resolved the question. If all of the facts were presented to Sun Life in 2004, it would have done so. Additionally, Wilkinson argues that it is "irresponsible" for Sun Life to interpret another insurer's policy. There was no other way to respond to Wilkinson's erroneous arguments regarding the Unum coverage.

### H.     Sun Life Cannot be Estopped from Denying Benefits Not Owed.

Wilkinson next argues that Sun Life should be estopped from denying coverage since the issue was not raised until 2009 and it would "deprive Wilkinson of his contractually-owed benefits." He further argues that allowing Sun Life to terminate benefits is an "untenable result" because he "had group disability coverage at all times through either Unum or Sun Life." As in *McKay*, Wilkinson is not entitled to benefits under the unambiguous terms of either policy. Therefore, there is nothing untenable or inequitable.

23

The elements of equitable estoppel are not met under the undisputed facts presented in this case.  Under this doctrine, "he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." *Dickerson v. Colgrove,* 100 U.S. 578, 580 (1879).  Sun Life did not cause Wilkinson to apply for benefits under its policy.  He did this on his own.  Nor did the erroneous payment of benefits by Sun Life for four years cause any harm to Wilkinson because he was not eligible for benefits under any other disability policy.

Wilkinson's estoppel argument is also contrary to this Court's unpublished decision in *Hensley v. IBM*, 123 Fed. Appx. 534, 538 (4th Cir. 2004).  There, the Court stated that "no vested right to benefits accrues under an employee welfare benefits plan, so that 'the decision to grant benefits initially cannot create an obligation by which a plan fiduciary is estopped from later terminating benefits.'" *Id*. (citation omitted).  Wilkinson cannot shift the blame (or the burden of proof) for his failure to prove that he was insured under the Sun Life Policy.

Equitable relief is also unavailable based on *CIGNA Corp. v. Amara,* __ U.S. __, 131 S. Ct. 1866, 1881, 179 L.Ed.2d 843 (2011).  In *Amara*, the Supreme Court stated that equitable relief applies "only upon a showing of actual harm."  Wilkinson cannot identify any harm that he sustained as a result of receiving

erroneous benefit payments. Therefore, there can be no claim for etoppel. For the same reason, any claim based on laches must also fail. *See EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 409 (4th Cir. 2005) (holding that the equitable defense of laches requires prejudice to the party asserting it).

There is an additional reason why equitable remedies cannot be relied on by Wilkinson for coverage. It is a familiar maxim that a person seeking equity must have "clean hands." This rule "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery*, 324 U.S. 806, 814 (1945).

In awarding benefits to Wilkinson, Sun Life relied on statements by him and his doctor that the disability began on May 7, 2004. We now know that this information is incorrect. As explained above, bad faith on the part of Wilkinson is not required. It is sufficient that he induced Sun Life to award benefits based on erroneous information to "close the doors" of equity to him. This result is especially warranted because Wilkinson was never eligible to receive disability benefits under the Sun Life or the Unum disability policies.

## I.      Sun Life is Entitled to Judgment on the Counterclaim.

Wilkinson argues that the Reimbursement Agreement does not apply to the overpayment of benefits.  The language in the Agreement could not be any clearer. Under the Agreement signed by Wilkinson, he:

> agree(d) to repay [Sun Life] immediately in a lump all benefits that may have been overpaid, regardless of whether or not [his] coverage under this policy is in force on the date of any such payment.

JA 1317.

It is Wilkinson's position that the Reimbursement Agreement only applies to the recovery of overpayments resulting from his receipt of Other Income as defined by the Plan.  While the Agreement refers to Other Income in certain places, the term "Other Income" does not appear in the title of the Agreement. Other Income is also not mentioned in the subject line of the Agreement which broadly refers to "Long Term Disability Coverage."  JA 1317.

Contrary to Wilkinson's position, the Reimbursement Agreement requires him to repay Sun Life for any overpayment "regardless of whether or not [his] coverage under this policy is in force on the date of any such payment."  JA 1317. Thus, the Agreement contemplates the precise situation in this case and requires Wilkinson to reimburse Sun Life.

Wilkinson also tries to avoid his obligation to Sun Life by arguing that any right to reimbursement must be stated in the plan itself. This narrow view has been rejected by numerous courts. In *Northcutt v. Gen. Motors Hourly-Rate Employees Pension Plan,* 467 F.3d 1031, 1036-37 (7th Cir. 2006), the participant signed a Reimbursement Agreement permitting the plan to recover overpayments. The court rejected the participant's argument that the Agreement was unenforceable. "We cannot accept the argument that the contractual reimbursement arrangement at issue here is simply an elliptical arrangement to evade the strictures of § 502 and afford 'legal relief' to GM that is not permitted by the statute." *Id.* at 1037. *See also*, *Jones v. Life Ins. Co. of North America*, 829 F. Supp. 2d 165 (W.D. N.Y. 2011) (reimbursement agreement created an equitable lien by agreement); *Parent v. Principal Life Ins. Co.*, 763 F. Supp. 2d 257 (D. Mass. 2011) (enforcing the reimbursement agreement and stating, "[t]his court can conceive of no clearer language than that of the Reimbursement Agreement); *Lamb v. Hartford Life and Acc. Ins. Co.*, 862 F. Supp. 2d 1342 (M.D. Ga. 2012) (same).

Sun Life will not dwell for long on the remaining argument presented by Wilkinson. Currently there is a split in the circuits on whether a plan can recover under a lien by agreement such as exists here when the funds owed back to the plan have been dissipated. There is no reason for this Court to weigh in on the issue because it will be resolved this term by the Supreme Court. *See Montanile v.*

*Bd. Of Trustees of the Nat'l Elevator Ind. Health Ben. Plan*, No. 14-723.  In the event the Supreme Court decides in favor of the plan, Sun Life is entitled to judgment on its counterclaim.

## CONCLUSION

Eligibility for coverage under the Sun Life policy required Wilkinson to actually work full-time on or after May 1, 2004.  Wilkinson has not identified any evidence that he worked during the relevant period.  On the other hand, substantial evidence proves that Wilkinson stopped working weeks before Sun Life began insuring the disability plan, including his own Declaration.  The district court arrived at its erroneous conclusion in favor of Wilkinson by relying on improper evidence, failing to apply the language in the Policy and misapplying the law of this Circuit.  Accordingly, the judgment of the district court should be reversed and judgment entered in favor of Sun Life on all claims.

/s/ Joshua Bachrach
Joshua Bachrach
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Two Commerce Square
2001 Market Street, Suite 3100
Philadelphia, PA 19103
215-606-3906
joshua.bachrach@wilsonelser.com

Hannah Gray Styron Symonds
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
260 Franklin Street, 14th Floor
Boston, MA 02110
617-422-5300
Hannah.Symonds@wilsonelser.com
*Counsel for Defendant – Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 6,659 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS WORD 2010 in Times New Roman, font size 14.

/s/ Joshua Bachrach
Joshua Bachrach
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Two Commerce Square
2001 Market Street, Suite 3100
Philadelphia, PA 19103
215-606-3906
joshua.bachrach@wilsonelser.com

Hannah Gray Styron Symonds
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
260 Franklin Street, 14th Floor
Boston, MA 02110
617-422-5300
Hannah.Symonds@wilsonelser.com
*Counsel for Defendant – Appellant*

## CERTIFICATE OF SERVICE

This is to certify that on January 5, 2016, I electronically filed the foregoing Reply Brief with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served, listed below. Any counsel not ECF registered will be served via Federal Express (FedEx):

Norris Arden Adams, II
ESSEX & RICHARDS, PA
1701 South Boulevard
Charlotte, NC 28203-4727
704-377-4300
NAdams@essexrichards.com

Frank Nicholas Darras
Phillip Sinclair Bather
Susan Borondia Grabarsky
DARRASLAW
3257 East Guasti Road, Suite 300
Ontario, CA 91761
909-390-3770
Frank@DarrasLaw.com
PBather@DarrasLaw.com
SGrabarsky@DarrasLaw.com
*Counsel for Plaintiff - Appellee*

/s/ Joshua Bachrach
Joshua Bachrach
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Two Commerce Square
2001 Market Street, Suite 3100
Philadelphia, PA 19103
215-606-3906
joshua.bachrach@wilsonelser.com

Hannah Gray Styron Symonds
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
260 Franklin Street, 14th Floor
Boston, MA 02110
617-422-5300
Hannah.Symonds@wilsonelser.com
*Counsel for Defendant – Appellant*